1  Kane Moon (SBN 249834)
       kmoon@moonlawgroup.com
2  H. Scott Leviant (SBN 200834)
       hsleviant@moonlawgroup.com
3  Sandy Pham (SBN 352753)
       spham@moonlawgroup.com
4  **MOON LAW GROUP, PC**
   725 S. Figueroa St., Suite 3100
5  Los Angeles, California 90017
   Telephone: (213) 232-3128
6  Facsimile: (213) 232-3125

7  Attorneys for Plaintiff

8              UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10

11  ARNOLD SAMUEL CASTRO             Case No.: 3:24-cv-00747-TWR-LR
    individually, and on behalf of all others
12  similarly situated,                CLASS ACTION

13          *Plaintiff*,              **PLAINTIFF'S OPPOSITION TO
                                       DEFENDANT'S MOTION FOR
14      vs.                            SUMMARY JUDGMENT**

15  SPRECKELS SUGAR COMPANY,
    INC., a California corporation; and DOES   Date:       September 4, 2005
16  1 through 10, inclusive,          Time:       1;30 p.m.
                                       Courtroom:  14A
17          *Defendants*.             Judge:      Hon. Todd W. Robinson

18                                     Action Filed: March 13, 2024
                                       Removed:     April 25, 2024
19                                     Trial Date:  Not set

20

21

22

23

24

25

26

27

28

1
2
3

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................... i

TABLE OF AUTHORITIES ........................................................................... iii

I.     INTRODUCTION .................................................................................... 1

II.    STATEMENT OF FACTS ........................................................................ 1

       A.    Claims at Issue in the Complaint and Facts Relevant to All Claims ......... 1

       B.    Defendant Failed to Pay Plaintiff All Wages Owed As a Result of
             Uncompensated Time Waiting to Clock in and out at a Timeclock .......... 2

             1.    Plaintiff Used the Biometric Timeclocks as Directed by Defendant,
                   But That Process Would Sometimes Require Plaintiff to Wait
                   Several Minutes or More When the Biometric Scanner Did Not
                   Function Properly ............................................................... 2

             2.    For Parts of Plaintiff's Employment, Plaintiff was Assigned a
                   Timeclock to Use, Negating the Option to Select a Less Congested
                   Timeclock ....................................................................... 4

       C.    Defendant Failed to Reimburse Necessary Business Expenses ................. 5

DISCUSSION ........................................................................................... 6

III.   STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT ...... 6

IV.    A TRIABLE ISSUE OF FACT EXISTS AS TO WHETHER DEFENDANT
       PAID PLAINTIFF FOR ALL TIME WORKED ...................................... 8

       A.    Defendant Is Not Entitled to Summary Judgment on Liability Theories
             Based on Unpaid Wages Because Disputed Facts Exist as to Plaintiff's
             Time Spent Waiting to Clock in and the Legal Standard Governing
             Compensable Work Must Be Applied With Due Consideration to
             California's Liberal Policy of Providing Worker Protections ................. 8

27
28

1     B.   LMRA Pre-emption Does Not Apply to California's Fundamental

2         Obligation Requiring the Payment of All Wages Owed for All Hours

3         Worked ........................................................................................... 16

4     C.   As to Derivative Claims Predicated Upon the Failure to Pay All Wages

5         Owed, Defendant Is Not Entitled to Summary Judgment ....................... 18

6     D.   Defendant Is Not Entitled to Summary Judgment on the Claim That

7         Defendant Failed to Indemnify Plaintiff for Necessary Business

8         Expenses Because Triable Issues of Fact Exist as to Whether

9         Defendant Reimbursed Plaintiff for All Necessary Business Expenses.. 18

10  V.   CONCLUSION ..................................................................................... 19

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

TABLE OF AUTHORITIES

2

3 **FEDERAL DECISIONAL AUTHORITY**

4 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505 (1986).........................7, 8

5 *Burnside v. Kiewit Pacific Corp.,* 491 F.3d 1053 (9th Cir. 2007) ....................................16

6 *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548 (1986) ........................................7

7 *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119 (9th Cir. 2014) .....7, 8

8 *Gregory v. SCIE, LLC*, 317 F.3d 1050 (9th Cir. 2003) ......................................................17

9 *Jackson v. Federal Express*, 766 F.3d 189 (2nd Cir. 2014)................................................6

10 *McGhee v. Tesoro Ref. & Mktg. Co. LLC*, 440 F. Supp. 3d 1062 (N.D. Cal. 2020).......16

11 *Ramos v. Baldor Specialty Foods, Inc.*, 687 F3d 554 (2nd Cir. 2012)...............................7

12 *Ridgeway v. Wal-Mart Stores, Inc.*, 107 F.Supp.3d 1044 (N.D. Cal. 2015)...................12

13 *Rose v. United States*, 905 F.2d 1257 (9th Cir. 1990) ........................................................7

14 *Southern Ins. Co. v. Affiliated FM Ins. Co.*, 830 F.3d 337 (5th Cir. 2016)........................7

15 *Tolan v. Cotton*, 572 U.S. 650, 134 S.Ct. 1861 (2014) .......................................................8

16 *United States v. One Tintoretto Painting*, 691 F2d 603 (2nd Cir. 1982) ...........................7

17 *Vasserman v. Henry Mayo Newhall Mem'l Hosp.*,

18     65 F. Supp. 3d 932, 942 (C.D. Cal. 2014) ....................................................................17

19

20 **CALIFORNIA DECISIONAL AUTHORITY**

21 *Bono Enters., Inc. v. Bradshaw*, 32 Cal.App.4th 968 (1995).............................................12

22 *Eicher v. Adv. Bus. Integrators, Inc.*, 151 Cal. App. 4th 1363 (2007) ...............................8

23 *Ex Parte Trombley*, 31 Cal. 2d 801 (1948) ........................................................................9

24 *Frlekin v. Apple Inc.*, 8 Cal. 5th 1038, 457 P.3d 526 (2020) ...........................................15

25 *Gattuso v. Harte-Hanks Shoppers, Inc.,* 42 Cal. 4th 554 (2007)......................................18

26 *Ghazaryan v. Diva Limousine, Ltd.*, 169 Cal. App. 4th 1524 (2008)...............................12

27 *Gould v. Maryland Sound Industries, Inc.* 31 Cal. App. 4th 1137 (1995).........................8

28

*Grissom v. Vons Cos., Inc.*, 1 Cal. App. 4th 52 (1991) ....................................18

*Jacobus v. Krambo Corp.*, 78 Cal. App. 4th 1096 (2000) ................................19

*Martinez v. Combs*, 49 Cal. 4th 35 (2010), as modified (June 9, 2010)............................9

*Mendiola v. CPS Sec. Solutions, Inc.*, 60 Cal.4th 833 (2015)....................................11, 12

*Morillion v. Royal Packing Co.,* 22 Cal. 4th 575 (2000) ........................................9, 11, 12

*Pineda v. Bank of America, N.A.,* 50 Cal. 4th 1389 (2010) ................................8

*Prachasaisoradej v. Ralphs Grocery Co., Inc.,* 42 Cal. 4th 217 (2007) ............................8

*Smith v. Superior Court*, 39 Cal. 4th 77 (2006) ....................................8

*Stafford v. Realty Bond Service Corp.*, 39 Cal.2d 797 (1952) ..........................................10

*Troester v. Starbucks Corp.*, 5 Cal. 5th 829, 421 P.3d 1114 (2018), *as modified on denial of reh'g* (Aug. 29, 2018)......................................12, 13, 14

*Viking Pools, Inc. v. Maloney*, 48 Cal.3d 602 (1989)......................................10

**STATUTES**

Labor Code § 226.7 ..........................................................13

Labor Code § 2802 ..........................................................18

**RULES**

Fed. R. Civ. P 56 ..........................................................6, 7

**OTHER AUTHORITIES**

*American Heritage Dictionary*..........................................................10

*Black's Law Dictionary* ..........................................................10, 11

*Merriam-Webster's Collegiate Dictionary* ..........................................................11

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   <u>INTRODUCTION</u>

This is wage and hour class action lawsuit involving hourly employees that worked for beet sugar processing company SPRECKELS SUGAR COMPANY, INC. ("SPRECKELS" or "Defendant") in California.

Plaintiff was a member of the United Food and Commercial Workers, Local 135, AFL-CIO, CLC labor union (the "Union"). Because of this, some of Plaintiff's claims are pre-empted by the Labor Management Relations Act ("LMRA"). In this Opposition, Plaintiff will address only those claims that are not pre-empted by LMRA.

As to the first of the viable theories of liability, unpaid wage claims and derivative claims based thereon, Plaintiff's theory of underpayment of wages involves mixed question of fact and law, where the legal outcome depends upon disputed questions of fact. Plaintiff testified that he was required to wait in line to clock in, sometimes for several minutes.  Plaintiff further testified that the wait time was occasionally exacerbated by instances where the biometric eye scanner on the timeclock failed on numerous attempts to recognize an employee, causing additional waiting time to clock in.  As a result, not only was Plaintiff not compensated for time spent waiting to access a timeclock that employees were required by Defendant to use, but Plaintiff's wage statements also misstated his owed wages and time worked, and Plaintiff's final wages were incomplete.

As to the second of the viable theories of liability, failure to reimburse for necessary business expenses, disputed questions of fact exist that preclude summary judgment on this theory as well.  Plaintiff incurred specific expenses, testifying about their essential work purpose and lack of reimbursement by Defendant. That is sufficient to preclude Defendant's request for summary judgment as to this claim.

## II.   <u>STATEMENT OF FACTS</u>

### A.   <u>Claims at Issue in the Complaint and Facts Relevant to All Claims</u>

The First Amended Complaint alleges claims for relief as follows: (1) Failure to Pay

Minimum Wages; (2) Failure to Pay Overtime Compensation; (3) Failure to Provide Meal Period); (4) Failure to Provide Rest Periods; (5) Failure to Indemnify Necessary Business Expense); (6) Failure to Timely Pay Final Wages at Termination; (7) Failure to Provide Accurate Written Wage Statements; (8) Unfair Competition; and, (9) Civil Penalties under PAGA. (Dkt. 8.) The only causes of action that are not effectively barred by LMRA pre-emption are the **first** and **second** claims for relief related to wage payments, along with the derivative claims for relief stated in the **sixth**, **seventh**, and **eighth** claims for relief (the UCL claim being relevant primarily to extend the statute of limitation on unpaid wage claims).

    **B.**    <u>**Defendant Failed to Pay Plaintiff All Wages Owed As a Result of Uncompensated Time Waiting to Clock in and out at a Timeclock**</u>

        **1.**    **Plaintiff Used the Biometric Timeclocks as Directed by Defendant, But That Process Would Sometimes Require Plaintiff to Wait Several Minutes or More When the Biometric Scanner Did Not Function Properly**

Plaintiff used a biometric timeclock to clock in and out for work and lunch. The wait to get to a timeclock sometimes took Plaintiff many minutes because of the number of people waiting in line and the occasional problems the timeclocks had with correctly recognizing an employee on the first attempt:

    Q.  Describe to me the process of clocking in.

    A.  You use your eye. It scans it. But sometimes the machine freezes up, and while that's happening, because it's teams of people that have to clock in, you're waiting and waiting until it's your turn. Wherever it says that you have to look at, that's where you look at so that it can scan.

    Q.  How long does the actual scan take?

    A.  If you're standing in line, a few minutes.

    Q.  How long does it actually take to scan the eyes when you're in front of the machine?

    A.  If it's your first scan and it works, I would say a fraction of seconds.

    Q.  And if it freezes, how long would it take to scan your eyes?

A.  I wouldn't be able to tell you.  I don't know.  Maybe a few minutes.

Q.  How long would it take to reset when it froze?

A.  It's not necessarily that it freezes, but if it's not capturing the eye correctly, then it's there until it does.

Q.  And how long does that take?

A.  Several minutes.

Q.  How often would it freeze?

A.  It was happening all the time.  Sometimes it wouldn't happen. Sometimes it did.  But most of the times, it would happen.

Q.  In a week, can you estimate for me how many times it would happen?

A.  At least once.

Q.  A week?

A.  Mm-hm.

Q.  Correct?

A.  Yes.

Q.  And that's, in your experience, clocking in at least twice a day; correct?

A.  Four times, because I would clock in and out and then in and out for lunch.

Q.  So it would freeze or have difficulty capturing your eye, in your experience, at least once a week.  And you typically would clock in and out four times a day?

A.  Yes.  And not only for me but for all of the other employees, because we all used the machine.

Q.  Was the process in 2022, for clocking in, the same in 2023?

A.  Yes, ever since I started in 2021.

Q.  Was the rate of the machine being unable to capture the eye scan the same in 2023 as you've described in 2022?

A.  Yes, that is correct.

(Castro Depo., 40:19 to 42:19.)  But leaving one timeclock to try another with a shorter line had its own set of risks, since Plaintiff was sometimes unable to clock in on time after walking to another timeclock:

Did you ever have to go to a different scanner to clock in because there was too long of a line at the one that you normally would use?

A. Yes.

Q. Describe that for me.

A. When there was a very long line, we would go to the one by the lab.

Q. And would you still be able to clock in on time, then?

A. Well, maybe. Maybe yes or no. But I would inform the supervisor so that he would be aware.

(Castro Depo., 43:7 to 43:17.)

## 2. For Parts of Plaintiff's Employment, Plaintiff was Assigned a Timeclock to Use, Negating the Option to Select a Less Congested Timeclock

In 2022, Plaintiff was instructed to use one of the two timeclocks at the main entrance:

Q. In 2022, did you only clock in at the main administrative office location?

A. Yes.

Q. Why did you only go in at that one entrance?

A. Because that's where I was told to. That's where the machine is. Once you arrive, we all stand in line, and they have two machines. And that's where I was authorized to. I wasn't authorized to go to other places.

(Castro Depo., 35:15 to 35:23.) In 2023, when Plaintiff was assigned light duty work, he clocked in at the lab entrance. (Castro Depo., 37:18 – 23.) But, later, in 2023, after Plaintiff was harassed by a co-worker, Plaintiff was instructed to use a different, specific timeclock:

Q. Why, if you worked in the laboratory doing light duty, were you clocking in the main entrance?

 A. I will explain. Because there was an altercation with one of the employees, Damian. He had been there for many years, and he started insulting me because...

. . .

He was insulting me, saying that I wasn't doing anything. There was another employee, Elizabeth, and she told me that I should say something when we went to go pick up our checks, and the president was there, and his secretary was there. So I told them what had happened, and that's why they moved me to a different place.

(Castro Depo., 38:2 to 38:16.)

Q.  And then you switched back to clocking in at the main entrance?

A.  Yes, because of the incident that occurred.

(Castro Depo., 39:21 to 39:23.)  Thus, despite Defendant's touting of the number of timeclocks at its large facility, Plaintiff received instructions to use specific timeclocks at various times and was thus not allowed to attempt to avoid the employees using a congested timeclock by walking through the large facility to another timeclock location, which were "several" minutes apart:

Q.  How physically far apart were these two entrances that you were aware of, that had time clocks?

A.  I have no idea, but they were kind of far, one from the other.

Q.  How long would it take you to walk between the two of them, if you can estimate?

A.  Several minutes.  I don't know how many.

Q.  When you say, "several minutes," do you mean two?

A.  Possibly, maybe more, because they're not close by.

(Castro Depo., 34:18 to 35:4.)

**C.  <u>Defendant Failed to Reimburse Necessary Business Expenses</u>**

Plaintiff incurred expenses as a necessary result of his job duties, and those expenses were not reimbursed by Defendant.  When Plaintiff was assigned to night shift work, he, like other employees, had to purchase lights to affix to his hard hat:

Q.  Did you have to buy any other equipment in 2022?

A.  We had to buy our own -- for example, when I had to work the night shift in 2022, I had to buy my own light for my hard hat, kind of like the ones that the miners use.

(Castro Depo., 50:11 – 16.)  The lights were necessary to discharge his duties:

Q.  During the night shift, were there lights where you were working?

A.  Only where the machines were operating, but there's other areas where you had to go work, and there was no -- you had to have your light there because there were no lights.

Q.  Did they provide flashlights at the company?

A.  No.

(Castro Depo., 50:21 to 51:3.)  Plaintiff also had to buy safety boots and adequate gloves, since the gloves provided by Defendant were inadequate and no boots were provided:

Q.  Did you have to purchase any equipment to perform any of the job functions that you did for Spreckels in 2022 and 2023?

A.  Yes.

Q.  What equipment did you have to buy in 2022?

A.  Gloves, my shoes, because my work boots had to be steel-toed.

Q.  Did the company provide you gloves or shoes?

A.  They did provide gloves, but the gloves that they were providing were not appropriate for the work that you had to do.  So we had to -- most of us went out and bought, for example, gloves that were still providing protection but they were more adequate for the work we had to do. And everyone had to buy their own boots.

Q.  Did you get reimbursed for any of those expenses?

A.  No, never.

(Castro Depo., 49:13 to 50:5.)

## **DISCUSSION**

## III.  **STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT**

The core standard regulating summary judgment requires that, before summary judgment may be granted, the court find there is "no genuine dispute as to any material fact and that the movant is entitled to judgment *as a matter of law*." Fed. R. Civ. P 56(a) (emphasis added).  In addition, the court must "determine whether the legal theory of the motion is sound." *Jackson v. Federal Express*, 766 F.3d 189, 194 (2nd Cir. 2014).  Fed. R. Civ. P 56 must be construed "with due regard … for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a

jury …" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555 (1986). Summary judgment is a drastic remedy and is therefore to be granted cautiously: "Neither do we suggest that the trial courts should act other than with caution in granting summary judgment …" *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513-2514 (1986).

When the application of a rule of law depends on resolution of underlying historical facts, it becomes a mixed question of law and fact. *See, e.g., Rose v. United States*, 905 F.2d 1257, 1259 (9th Cir. 1990).  If the historical facts are in dispute, the matter generally must go to trial. Labor law violations commonly involve mixed questions of law and fact. For example, whether an employee falls within the executive exemption from the Fair Labor Standards Act's overtime compensation protections presents a mixed question of law and fact.  *Ramos v. Baldor Specialty Foods, Inc*., 687 F3d 554, 558 (2nd Cir. 2012).

Summary judgment cannot be granted when a dispute exists as to any "material fact." Fed. R. Civ. P 56(a).  "Material" facts are those that, under applicable substantive law, may affect the outcome of the case: "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment … [I]t is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014).  A factual dispute is "genuine" when "the evidence is such that a *reasonable jury could return a verdict for the nonmoving party*." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510 (emphasis added); *Southern Ins. Co. v. Affiliated FM Ins. Co*., 830 F.3d 337, 343-344 (5th Cir. 2016); *Fresno Motors, LLC*, 771 F.3d at 1125.

Fed. R. Civ. P 56 does not permit trial by affidavits. The court's function on a motion for summary judgment is issue-finding, not issue-resolution. *United States v. One Tintoretto Painting*, 691 F2d 603, 606 (2nd Cir. 1982).  "The judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine

whether there is a genuine issue for trial … Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions …" *Anderson*, 477 US at 249-255, 106 S.Ct. at 2511-2513.  In addition to the bar on weighing of evidence, the court must view the evidence presented on the motion in the light most favorable to the opposing party: "The evidence of the non-movant ***is to be believed***, and ***all justifiable inferences are to be drawn in his favor*.**" *Anderson*, 477 US at 255, 106 S.Ct. at 2513 (emphasis added); *Tolan v. Cotton*, 572 U.S. 650, 651, 134 S.Ct. 1861, 1863 (2014); *see Fresno Motors, LLC*, 771 F3d at 1125.

## IV.    A TRIABLE ISSUE OF FACT EXISTS AS TO WHETHER DEFENDANT PAID PLAINTIFF FOR ALL TIME WORKED

### A.    Defendant Is Not Entitled to Summary Judgment on Liability Theories Based on Unpaid Wages Because Disputed Facts Exist as to Plaintiff's Time Spent Waiting to Clock in and the Legal Standard Governing Compensable Work Must Be Applied With Due Consideration to California's Liberal Policy of Providing Worker Protections

"Because the laws authorizing the regulation of wages, hours, and working conditions are remedial in nature, courts construe these provisions liberally, with an eye to promoting the worker protections they were intended to provide." *Prachasaisoradej v. Ralphs Grocery Co., Inc.,* 42 Cal. 4th 217, 227 (2007).  "[T]he public policy in favor of full and prompt payment of an employee's earned wages is fundamental and established." *Smith v. Superior Court*, 39 Cal. 4th 77, 82 (2006); *accord Pineda v. Bank of America, N.A.,* 50 Cal. 4th 1389, 1400 (2010).  "Public policy favors employees in their efforts to recover overtime compensation." *Eicher v. Adv. Bus. Integrators, Inc.*, 151 Cal. App. 4th 1363, 1383 (2007), citing *Gould v. Maryland Sound Industries, Inc.* 31 Cal. App. 4th 1137, 1148 (1995) (broad public interest in enforcing overtime laws).  This public policy favoring the protection of employees and their right to receive all wages due is rooted in a recognition of "the economic position of the average worker and, in particular, his

1  dependence on wages for the necessities of life, for himself and for his family." *Ex Parte*

2  *Trombley*, 31 Cal. 2d 801, 809 (1948). Evidencing the importance of this public policy,

3  one that has existed in California for more than a century, it is a criminal offense for an

4  employer to willfully fail to pay wages owed. Labor Code § 216.

5      California's strong policy of protecting employees has been clearly stated for more

6  than a century, beginning no later than the enactment of California's original minimum

7  wage statute in 1913. *Martinez v. Combs*, 49 Cal. 4th 35, 52-53 (2010), as modified (June

8  9, 2010). The enactment was a result of national recognition of "the low wages, long

9  hours, and poor working conditions, under which women and children often labored." *Id.*,

10 at 53. "California's legislation called for a commission to study and then adopt minimum

11 wage rates and to make it a crime not to pay minimum wage." *Id.* This predated the 1938

12 passage by Congress of the FLSA. *Id.* The California Legislature subsequently expanded

13 the IWC's jurisdiction to extend to all employees, not just women and children. *Id.,* at 55.

14 Further, the Legislature has "'restated the [IWC's] responsibility in even broader terms,'"

15 imposing a "'continuing duty'" to "adopt new wage orders 'if the commission finds that

16 'wages paid to employees may be inadequate to supply the cost of proper living.'" *Id.*;

17 Lab. Code § 1178.5(a).

18      Under the Wage Orders, employers must pay employees the minimum wage for all

19 "hours worked." Wage Orders, Subd. 4(A).  Hours worked includes all time that the

20 employee is subject to the *control* of the employer and includes all time that the employee

21 is "suffered or permitted to work" by the employer "whether or not required to do so."

22 Wage Orders, Subd. 2(K); *Morillion v. Royal Packing Co.,* 22 Cal. 4th 575, 585-86

23 (2000). An employer suffers or permits work where the employer knows (or should know)

24 that work is occurring and fails to prevent it.  *Martinez*, 49 Cal. 4th at 70.

25      The adoption history of the "control" test shows that the IWC deliberately

26 abandoned less-protective prior language, under which only certain listed "required" acts

27 were compensable, and replaced it with the broader, present-day "control" test.  The

28 IWC's deliberate choice to jettison the word "require" and replace it with "control" would

become a meaningless amendment if "control" does not carry with it a meaning broader than the prior term "require."  Courts do not presume that regulatory bodies like the IWC make pointless changes to the text of their regulations.  *See, e.g.*, *Viking Pools, Inc. v. Maloney*, 48 Cal.3d 602, 609 (1989); *Stafford v. Realty Bond Service Corp.*, 39 Cal.2d 797, 805 (1952).  This is particularly unlikely in the IWC's case, given that any textual changes to the Wage Orders must be preceded by extensive, statutorily-mandated proceedings, including multiple public hearings.[1]

The IWC's chosen word "control" is broad enough to encompass "required" actions, while also embracing those that are "directed," "restrained" or "regulated" by an employer.  The IWC selected the phrase "subject to the *control* of an employer," not "subject to the requirement" or "direction of an employer."  It chose this word knowingly, in order to "broaden" the definition of compensable "hours worked."  Under the broad definition of "control," is possible to "direct" a non-"required" activity.  The plain-language definition of the word "direct" includes to "guide (something or someone),"[2] and to "manage," "regulate," "supervise or oversee."[3]  Thus, "control" captures a broader set of concepts reflecting the imposition or application of authority in different degrees. It is not limited to "required" or "compulsory" actions.  For example, a police officer may "direct" a driver who chooses, but is not required, to turn left.  The noun form of the word, "direction," includes both "[a]n act of guidance" and "an instruction on how to proceed"[4]—neither of which presupposes a "required" or "compulsory" act.

Notably, in 1947, the IWC *retained* the "required" phrase as part of the "suffered or

---

[1] These requirements date back to the legislation through which the IWC was first created.

[2] *Black's Law Dictionary*, "direct," *vb.*, sense 3 (10th ed. 2014) ("to guide (something or someone); to govern").  *See also American Heritage Dictionary*, "direct," *v.tr.*, sense 2 (5th ed. 2018) ("give guidance and instruction to").

[3] *American Heritage Dictionary*, "direct," *v.tr.*, sense 1.

[4] *Black's, supra*, "direction," *n.*, senses 3, 4; *see also American Heritage Dictionary, supra*, "direction," *n.*, sense 1 ("management, supervision or guidance of a group or operation").

permitted to work" prong of the test, while at the same time omitting a list of illustrative examples from that test.[5]   Simultaneously, the IWC chose to *remove* the word "require" from the first test, and *replace* it with the broader word "control."  These amendments achieved the IWC's goal of "broadening" the definition of compensable "hours worked," while also making plain that "required" activity is not a part of *either* test.

Far from "surplusage," the final phrase ensures that the "suffered or permitted to work" test encompasses both "required" and non-"required" "work"—so long as the "work" was "suffered or permitted" by an employer, which means the employer knew or should have known it was occurring.  *Morillion*, 22 Cal. 4th at 584-85.  An employer who sits by passively while an employee engages in unrequested "work" must nevertheless compensate the employee for all of that "work."  The "control" test, in contrast, is not limited to "work," but instead embraces all "*time* during which an employee is subject to the control of the employer."

Each word and phrase of the "control" test plays a role.  The word "time" makes plain that non-"work" that the employer decides to "control" is compensable, such as the bus-ride time in *Morillion*.  *Id.*, at 582.  The phrase "during which" directs the focus onto the "controlled" time itself, not what may have preceded it.  The phrase "subject to" ensures that on-call time, for example, is compensable.[6]  And the word "control," which the IWC selected to replace the narrower word "require," ensures that all "controlled" time, whether "required" or not, is treated as compensable.  The two "independent" tests, *Morillion*, 22 Cal.4th at 582, thus function together to protect employees broadly and ensure they are compensated for all "hours worked."

---

[5] *Compare id. with* Wage Order 7 R ¶2(h) (Feb. 1, 1947, eff. Jun. 1, 1947).

[6] *See, e.g.*, *Mendiola v. CPS Sec. Solutions, Inc.*, 60 Cal.4th 833, 840-41 (2015) ("on call" time can meet Wage Order's "control" test and be compensable although no "work" is occurring); *Black's, supra*, "subject," senses 2, 3 ("exposed, liable, or prone" to something; "dependent on or exposed to (some contingency)"); *Merriam-Webster's Collegiate Dictionary*, "subject to" (11th ed. 2003) ("affected or *possibly* affected by (something)" (emphasis added)), *cited in Augustus*, 2 Cal.5th at 265.  An employee engaged to wait must be compensated for that *time*, even though no "work" is occurring.

Courts applying *Morillon* have had no difficulty holding that all time "during which" an employer exercises "control" is compensable—notwithstanding the employees' supposed ability to "choose" to "avoid" it.[7]  Consistent with the broadly accepted construction of *Morillion*, the California Supreme Court, in *Mendiola*, recognized that time during which security guards were required to remain on site was "controlled" under *Morillion*, even though the guards could have avoided this "control" by requesting permission "to leave the worksite." *Mendiola*, 60 Cal. 4th at 837, 841.  The Court reached this conclusion because, under the Wage Orders, "the extent" or "level" "of the employer's control" during the time in question is what is "'determinative.'"  *Id.* at 840 (quoting *Morillion*, 22 Cal. 4th at 587, and citing *Ghazaryan v. Diva Limousine, Ltd.*, 169 Cal. App. 4th 1524, 1535 (2008) and *Bono*, 32 Cal. App. 4th at 974-75).  And in *Bono*, the employees could have avoided the restraint of otherwise mandatory on-site meal periods by making "prior arrangements to reenter the plant after leaving for lunch." 32 Cal. App. 4th at 972.  This distinction was "extremely significant," because those employees who *did* make such "prior arrangements" were not "subject to the employer's control." *Id.* at 978, n.4.  Consistent with the rule that the Wage Orders "must be liberally construed to accomplish" the "primary objective of protecting workers," the time was deemed compensable in *Bono*.  *Id.*, at 974-75.

As recently emphasized by the California Supreme Court, it is a "core statutory and regulatory purpose that employees be paid for all time worked." *Troester v. Starbucks Corp.*, 5 Cal. 5th 829, 421 P.3d 1114, 1124 (2018), *as modified on denial of reh'g* (Aug. 29, 2018).  Examining the long historical precedent for that policy, the Supreme Court noted that, in 1947, the IWC defined "hours worked" to encompass all time spent under

---

[7] *See*, *e.g.*, *Bono Enters., Inc. v. Bradshaw*, 32 Cal.App.4th 968, 972, 974-75 (1995) (time "controlled" under *Morillion* although employees could have avoided the restraint (on-site meal periods) by choosing to make "prior arrangements"); *Ridgeway v. Wal-Mart Stores, Inc.*, 107 F.Supp.3d 1044, 1054-55 (N.D. Cal. 2015) (time "controlled" under *Morillion* although employees could have avoided the restraint (on-site layover time) by requesting and obtaining "prior" permission to leave).

the employer's control:

> It is also instructive that the IWC in defining "hours worked" appeared to give little weight to the customary employment practices that informed Congress's decision to enact the Portal-to-Portal Act and instead placed more importance on the policy of ensuring that employees are fully compensated for all time spent in the employer's control.

*Troester*, 5 Cal. 5th at 845.  In that same decision, the California Supreme Court recognized that California's wage and hour laws care for "small things," indicating that infringements of obligations in even tiny amounts are improper:

> We have said that application of a de minimis rule is inappropriate when "the law under which this action is prosecuted does care for small things." *(Francais v. Somps* (1891) 92 Cal. 503, 506, 28 P. 592.) In deciding whether application of the de minimis rule in this case would be consistent with the governing wage order and Labor Code statutes, we observe that the regulatory scheme of which the relevant statutes and wage order provisions are a part is indeed concerned with "small things." For example, California law ensures that most nonexempt employees receive two daily 10-minute rest breaks. (Wage Order No. 5, subd. (12)(A); see *Brinker, supra,* 53 Cal.4th at p. 1031, 139 Cal.Rptr.3d 315, 273 P.3d 513.) We have interpreted Wage Order No. 5 as requiring strict adherence to that requirement, and we have scrupulously guarded against encroachments on this 10-minute period. Thus, we recently held that the obligation to relieve employees of any work-related duties during the rest period barred employers from requiring employees to be on call during their rest breaks and that breach of this duty triggers an employer's obligation under section 226.7, subdivision (b) to pay the employee an additional hour of pay. *(ABM Security, supra,* 2 Cal.5th at p. 265, 211 Cal.Rptr.3d 634, 385 P.3d 823.)

*Troester*, 5 Cal. 5th at 844.  *Troester* also re-emphasized the remedial purpose calling for liberal construction of all wage payment obligations in favor of employees:

> In light of the Wage Order's remedial purpose requiring a liberal construction, its directive to compensate employees for all time worked, the evident priority it accorded that mandate notwithstanding customary employment arrangements, and its concern with small amounts of time, we conclude that the de minimis doctrine has no application under the circumstances presented here. An employer that requires its employees to work minutes off the clock on a regular basis or as a regular feature of the job may not evade the obligation to compensate the employee for that time by invoking the de minimis doctrine. As the facts here demonstrate, a few extra minutes of work each day can add up.

*Troester*, 5 Cal. 5th at 847.  Based on these strong policies, the Supreme Court held that employers must bear the burden of determining how to ensure that all time is paid, taking every effort to avoid placing the burden of any difficulty recording time on the employee:

> But employers are in a better position than employees to devise alternatives that would permit the tracking of small amounts of regularly occurring work time. One such alternative, which it appears Starbucks eventually resorted to here, was to restructure the work so that employees would not have to work before or after clocking out. Moreover, as noted, technological advances may help with tracking small amounts of time. An employer may be able to customize and adapt available time tracking tools or develop new ones when no off-the-shelf product meets its needs. And even when neither a restructuring of work nor a technological fix is practical, it may be possible to reasonably estimate work time—for example, through surveys, time studies, or, as *See's Candy* suggested, a fair rounding policy—and to compensate employees for that time.  Under the circumstances of this case, we decline to adopt a rule that would require the employee to bear the entire burden of any difficulty in recording regularly occurring work time.

*Troester*, 5 Cal. 5th at 848.  Applying these principles, *Troester* held that amounts of time less than a minute should be accounted for in some way, and should be paid.

Here, where Defendant established circumstances, for its benefit, that forced Plaintiff to wait in line many minutes to clock in for his shift.  Defendant "knew or should have known" that this was occurring because it happened in plain view of supervisors.  As Plaintiff's deposition testimony, cited above, said, the wait to clock in was a few minutes if nothing went wrong, and it could take several minutes longer to clock in if the timeclock was having difficulty registering an employee's identity.  Plaintiff stated that, at least once a week, on average, he encountered a problem with the timeclock's ability to recognize him correctly.  Consistent with this deposition testimony, Plaintiff previously declared in this action:

> Because the timeclocks were unpredictable about how well they would work, I and other employees had to arrive early enough to be sure that we could get to a timeclock, get through the line, and then clock in by our scheduled start time. There were usually ten or more individuals in line for each timeclock. The time needed to get clocked in after getting in line varied, and on some occasions the wait to get through the timeclock line took up to five minutes. But since I and other employees did not know if we would be waiting in line for five minutes or two minutes or three minutes, we had to arrive early to be sure we could get to the timeclock and then clock in on time. We were not paid for arriving early to be sure we could clock in on time. We were not paid for standing in line for two to five minutes each shift while waiting for our turn at a timeclock.

(Castro Declaration: Dkt No. 22-8, at ¶ 6, filed Jan. 6, 2025.)  And, as noted above, Plaintiff testified that on multiple occasions he was assigned to a specific timeclock or set

of timeclocks. Plaintiff's testimony as to this assignment defeats Defendant's attempt to characterize the timeclock delays as "happenstance" that did not involve any "control" by Defendant. While Defendant purports to treat timeclock delays, even sporadic ones as akin to commuting, the timeclock delays are more analogous to the compensability of bag check policies, and it is in that context that the "control" argument of Defendant fails. In *Frlekin v. Apple Inc.*, 8 Cal. 5th 1038, 457 P.3d 526 (2020), the employer argued that activity must be "required" and "unavoidable" to be "compensable." The California Supreme Court rejected that view of the "control" clause:

> Apple asserts that an employee's activity must be "required" and "unavoidable" in order to be compensable. But those words do not appear in the control clause. Redefining the control clause to cover only unavoidably required employer-controlled activities would limit the scope of compensable activities, resulting in a narrow interpretation at odds with the wage order's fundamental purpose of protecting and benefitting employees.

*Frlekin v. Apple Inc.*, 8 Cal. 5th at 1048, 457 P.3d at 532. The Court noted that there is a distinction between commuting to work and any activities at work: "As a preliminary matter, there are inherent differences between cases involving time spent traveling to and from work, and time spent *at* work." *Frlekin*, 8 Cal. 5th at 1051, 457 P.3d at 534. Here, similar to *Frlekin*, Defendant has a heightened business interest in the method used by employees to clock in for work: "Because Apple's business interests and level of control are greater in the context of an onsite search, the mandatory/voluntary distinction applied in *Morillion* is not dispositive in this context. *Frlekin*, 8 Cal. 5th at 1051, 457 P.3d at 535. The California Supreme Court easily rejected the very argument that Defendant makes here, supported by citation to *Overton* and others, attempting to compare optional employee commuting benefits to mandatory time recording systems used by the employer. "Here, like *Madera* and *Mendiola*, and unlike *Morillion* and *Overton*, the employer-controlled activity primarily serves the employer's interests." *Frlekin*, 8 Cal. 5th at 1052, 457 P.3d at 535 (2020). *Frlekin* found bag check time to be compensable even though employees could avoid the delay by not bringing a bag: "Furthermore, case law suggests that the employee's ability to avoid an employer-controlled activity is not dispositive

outside of the commuting context." *Frlekin*, 8 Cal. 5th at 1053, 457 P.3d at 536.  Here,

Plaintiff had no option to avoid Defendant's timeclocks, and, for some time periods,

Plaintiff testified that he was assigned to specific timeclock by Defendant, further

increasing the level of control exercised by Defendant.  Defendant is not entitled to

summary judgment on Plaintiff's theory of unpaid wages based on timeclock delays.

**B.    LMRA Pre-emption Does Not Apply to California's Fundamental Obligation Requiring the Payment of All Wages Owed for All Hours Worked**

The Ninth Circuit has articulated a two-part test to determine whether a cause of

action is preempted by the LMRA. *Burnside v. Kiewit Pacific Corp.,* 491 F.3d 1053, 1059

(9th Cir. 2007). First, the court must determine "whether the asserted cause of action

involves a right conferred upon an employee by virtue of state law, not by a CBA. If the

right exists solely as a result of the CBA, then the claim is preempted, and ... analysis

ends.... If however, the right exists independently of the CBA, [the court] must still

consider whether it is nevertheless 'substantially dependent on analysis of a collective-

bargaining agreement.' If such dependence exists, then the claim is preempted by section

301; if not, then the claim can proceed under state law." *Id.* at 1059–60 (citations omitted).

Merely referencing provisions of a CBA is not sufficient if the core question is

whether or not the employer violated California law:

> Although the Court may "look" at the relevant CBAs as evidence of those procedures, the focus remains on Defendants' actions, not the CBAs' authorizations. Put differently, whether Defendants violated or complied with the CBAs has no import whether they also violated of California law.

*McGhee v. Tesoro Ref. & Mktg. Co. LLC*, 440 F. Supp. 3d 1062, 1069 (N.D. Cal. 2020).

As McGhee noted, "The Ninth Circuit has held that when the issue centers on 'not [on]

how overtime rates are calculated but whether the result of the calculation complies with

California law,' no preemption applies." *McGhee*, 440 F. Supp. 3d at 1070.  Here,

Plaintiff alleges time worked that went without compensation that require, at best, the

referencing of any CBA documents.  The obligation to pay for all hours worked is not

excused.  *Vasserman* provides a particularly apposite example:

> Vasserman does not dispute the applicable wage rates that are provided in the CBA—instead, she argues that she was not paid overtime as required by California law. Although it is apparent that calculations will be required to resolve her overtime claims given the three overtime plans set forth in the CBAs, Newhall Memorial fails to show that this will require *interpretation* of the CBA, rather than reference to its undisputed terms. See *Livadas,* 512 U.S. at 124, 114 S.Ct. 2068 ("[W]hen the meaning of contract terms is not subject to dispute, the bare fact that a collective bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished"). Based on those undisputed terms, the court will have to assess "whether when overtime is paid under the CBA it is paid for *all overtime hours worked,* as required by California law." *Gregory,* 317 F.3d at 1053.

*Vasserman v. Henry Mayo Newhall Mem'l Hosp.*, 65 F. Supp. 3d 932, 957-58 (C.D. Cal. 2014).

Likewise, overtime claims are not pre-empted when the issue is the failure to pay for all hours worked.  CBA provisions are irrelevant to the evaluation of such overtime claims:

> Here, Gregory's claim is based entirely on state law. There is no dispute over the terms of the CBA or its interpretation. While overtime is calculated in accordance with the terms of the CBA, this case involves no issue concerning the *method* of calculation. The issue here is not *how* overtime rates are calculated but whether the *result* of the calculation complies with California law, i.e., whether Gregory is paid at premium wage rates for "*[a]ny work* in excess of eight hours in one workday and *any work* in excess of 40 hours in any one work week" (emphasis added), as required by California law. Cal. Lab. Code § 510. The issue arises because the work Gregory performed for SCIE on different productions exceeded in the aggregate eight hours in one work day and forty hours in one work week. He was not paid premium wage rates because SCIE does not lump together different productions to calculate overtime hours. The dispute between the parties may require interpretation of the words "any work" in the statute, but its resolution does not require reference to, much less interpretation of, the CBA.

*Gregory v. SCIE, LLC*, 317 F.3d 1050, 1053 (9th Cir. 2003).  Plaintiff has described conditions, created and required by Defendant, that raise a triable issue as to whether Plaintiff was paid all wages for all hours worked.  There is no defense that Defendant can assert to preclude Plaintiff's claim.

1

2

**C.**     **As to Derivative Claims Predicated Upon the Failure to Pay All Wages Owed, Defendant Is Not Entitled to Summary Judgment**

3

4

5

6

7

8

LMRA pre-emption as to derivative claims depends upon the basis underlying the derivative claim.  Here, the relevant underlying claims are claims for unpaid wages.  Because Plaintiff's unpaid wages theory of recovery states a claim for which disputed questions of fact exist, the underlying claims derivative thereto also remain.  The PAGA claim is supported to the extent that summary judgment is denied as to Plaintiff's claims related to unpaid wages.

9

10

11

12

**D.**     **Defendant Is Not Entitled to Summary Judgment on the Claim That Defendant Failed to Indemnify Plaintiff for Necessary Business Expenses Because Triable Issues of Fact Exist as to Whether Defendant Reimbursed Plaintiff for All Necessary Business Expenses**

13

14

15

16

17

18

19

20

21

22

23

24

25

California Labor Code § 2802 requires an employer, as part of its duty to indemnify employees, to reimburse employees for all amounts expended in carrying out their work duties. *Gattuso v. Harte-Hanks Shoppers, Inc.,* 42 Cal. 4th 554, 567 (2007). Labor Code § 2802 provides: "An employer shall indemnify his or her employee for ***all*** necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties." (Emphasis added). Accordingly, § 2802 provides for reimbursement where an employee's expenses are (1) "necessary," and (2) incurred "in direct consequence of the discharge of his or her duties." As to the first element, § 2802 itself provides that the term necessary expenditures "shall include all reasonable costs,"[8] and California courts have confirmed that expenditures which are "reasonable under the circumstances" must be reimbursed.  *Grissom v. Vons Cos., Inc.*, 1 Cal. App. 4th 52, 58 (1991). Courts have interpreted the second element, the requirement that the expenses be incurred "in direct consequence of the discharge of" an employee's duties, to mean only

26

27

28

---

[8] Labor Code § 2802(c) – There is no statutory requirement that the expenses be both reasonable and necessary; rather "reasonable" is used in this context to define when expenditures are "necessary".

that an expense was incurred within the course and scope of employment. *Jacobus v. Krambo Corp.*, 78 Cal. App. 4th 1096, 1100 (2000).

Here, Plaintiff testified that, while working the night shift, he was required to perform tasks in unlit areas, necessitating the purchase of a hard hat light.  That expense, according to Plaintiff, was not reimbursed.  Given the nature of the work, Plaintiff was required to wear steel-toed boots.  That expense, according to Plaintiff, was not reimbursed.  And, although Defendant provided gloves to employees, Plaintiff testified that the gloves were not adequate for the tasks that Plaintiff was directed to perform.  As a result, Plaintiff purchased his own work gloves and was not reimbursed for that purchase either.  Triable issues of fact exist as to Plaintiff's claim for indemnification of unreimbursed expenses, and Defendant is not entitled to summary judgment on this claim for relief.

## V.    <u>CONCLUSION</u>

Based on the foregoing, Plaintiff requests that the Court deny Defendant's Motion for Summary Judgment as to Plaintiff's claims for unpaid minimum and overtime wage, the claims derivative thereto (failure to accurate itemized wage statements and timely pay final wages), and the claim for failure to indemnify for necessary business expenses.

Respectfully submitted,

Dated:  July 17, 2025          **MOON LAW GROUP, PC**

By: _____

Kane Moon
H. Scott Leviant
Sandy Pham

Attorneys for Plaintiff ARNOLD SAMUEL CASTRO